Eileen YAJURE and Jorge
Yajure, Plaintiffs,

v.

Richard DIMARZO, individually, Eugene Tumulo, individually, John Kelly, individually, and The City of Peekskill, New York, Defendants.

No. 00 Civ. 7423(CM).

United States District Court,
S.D. New York.

Feb. 14, 2001.

---

Jonathan Lovett, Lovett & Gould, White Plains, NY, for Plaintiffs.

Paul Shechtman, Stillman & Friedman, New York City, for Defendants.

## MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

MCMAHON, District Judge.

Plaintiffs bring this action against defendants Acting Director of Public Works Richard DiMarzo, Chief of Police Eugene Tumulo, and Mayor John Kelly in their individual capacities, and The City of Peekskill, New York, under 42 U.S.C. § 1983 for (1) selective prosecution in violation of their rights guaranteed under the Equal Protection Clause of the Fourteenth Amendment; (2) violations of their rights of free speech, to petition government for the redress of grievances, and association as guaranteed by the First Amendment; and (3) violations of their right to be free from unreasonable seizures as guaranteed by the Fourth Amendment.

Defendants move to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. They also assert that DiMarzo, Tumulo and Kelly are entitled to qualified immunity for their actions, and that the federal civil rights complaint necessarily implicates the validity of plaintiffs' state court criminal conviction.

For the reasons stated below, defendants' motion to dismiss is granted.

## FACTS PERTINENT TO THE MOTION

In July 1997, plaintiffs and nine other Peekskill ("the City") residents founded "Friends of Historic Peekskill" ("the Organization"), an organization that advocates the preservation of historic resources within the City.

Also in 1997, City Councilman John Kelly challenged the incumbent mayor of the City, Fran Gibbs, in her bid for re-election. With the support of Eileen Yajure, Mayor Gibbs won re-election. In 1999, after Mayor Gibbs announced that she would not seek another term in office, Yajure challenged Councilman Kelly for Mayor, but lost. Since that time, plaintiffs allege that Mayor Kelly, acting by and through the City's Corporation Counsel, openly has threatened reprisals against certain residents of the City who supported Yajure in the election. Plaintiffs contend that Kelly arranged for the abolition of the City's Historic Preservation Advisory Board because members of that Board had supported Yajure.

Plaintiffs and their associates in Friends of Historic Peekskill later succeeded, through litigation, in barring the development of Fort Hill, a historic site the organization sought to protect.

In March 2000, plaintiffs learned of an intention by the Kelly Administration to demolish the historic Paraco Building ("the Building"). Eileen Yajure and her associates collected historical data regarding the Building, and they proposed that the City purchase and restore the Building rather than suffering its demolition. The City Council agreed to meet with those offering to purchase the Building on April 24, 2000, to review the historic data, and to consider the purchase of the Building. On April 21, 2000, the Friday before Easter Sunday, Mayor Kelly assured plaintiffs' associates

that the Building would not be demolished over the Easter weekend.

Despite these assurances, defendants apparently intended to proceed with the demolition on Easter weekend. To that end, Kelly, along with Tumulo and DiMarzo, arranged to have the demolition crew of Tran Camp Corporation arrive at the Building at or about 8:00 a.m. on April 22, 2000. The crew was admitted to the site with the permission of City officials and allowed to proceed with the demolition despite alleged violations of New York law in the demolition process.[1]

Plaintiffs somehow learned about the demolition and traveled to the site, where they evaded police barricades and entered without the City's permission. At or about the moment the motor on the demolition equipment was turned on by Tran Camp's operator, Eileen Yajure placed her foot into that equipment's claw, in an attempt to stop the operator of that equipment from commencing demolition. As Yajure placed her foot into the claw, the operator repeatedly raised and lowered the claw to force her to remove herself from the equipment. Meanwhile, her husband, Jorge Yajure, entered the Paraco lot and climbed up on a pile of woodchips which was adjacent to the Building's exterior walls. There he waved his arms and shouted for the equipment operator to stop. DiMarzo, who was on the scene, kept Tumulo and Kelly informed of the events via telephone.

The operator began to demolish the Building, and DiMarzo did not order them to stop. A police officer ran onto the Paraco lot and attempted to pull Mr. Yajure off the woodchip pile and away from the danger. The demolition continued, and DiMarzo ordered plaintiffs arrested and removed from the property. They were transported to Police Headquarters, where they were handcuffed to a bench for arrest processing. During that period, they shared the bench with an alleged child molester. DiMarzo signed a supporting deposition on the basis of which criminal charges—trespass and disorderly conduct—were filed against plaintiffs. After three hours, defendants were released from custody and issued appearance tickets. Plaintiffs later were convicted of the crimes of criminal trespass and disorderly conduct.

Plaintiffs allege that, in unnecessarily prolonging their imprisonment, defendants sought to punish them for their exercise of their First Amendment rights. They also charge that, by prosecuting plaintiffs, but not the demolition operators, defendants engaged in selective prosecution, motivated in substantial respect by a First Amendment retaliatory animus against plaintiffs. Finally, they allege that their three-hour detention amounted to an illegal seizure in violation of their Fourth Amendment rights.

## DISCUSSION

■■■ The role of a district court in considering a motion to dismiss is "not to

---

1. Plaintiffs charge that the presence of propane gas tanks violated the express provisions of the building demolition permit issued by the City to the demolition company; "Clearance Air Monitoring" had not been performed although required by the New York State Building Code; the City had not issued a "Notice to Proceed with Demolition," the issuance of which was a mandatory prerequisite for Tran Camp to enter upon the Building lot and to demolish the Building; a mandatory "sidewalk shed" required by the New York State Building Code had not been constructed; exterior glass window panes had not been removed, in violation of the New York State Building Code; dust control measures, mandated by the demolition permit, the demolition contract, and the New York State Building Code had been ignored; substantial barricades designed to keep from the demolition site persons not actually involved in the demolition itself, had not been erected, in violation of the New York State Building Code; mandatory pest extermination, required by both the demolition permit and contract, had not been performed; a mandatory examination of the exterior walls of that church had not been performed as required by New York State Building Code; and a mandatory temporary walkway intended to ensure the safety of pedestrians had not been constructed.

weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir.1985). The court must accept as true the factual allegations made in the complaint, *see LaBounty v. Adler,* 933 F.2d 121, 123 (2d Cir.1991), and the complaint should not be dismissed "unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

### 1. Fourteenth Amendment Selective Enforcement Claim

▮ To plead an Equal Protection claim for selective enforcement, plaintiff must prove: (1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person. *Lisa's Party City, Inc. v. Town of Henrietta,* 185 F.3d 12, 16 (2d Cir.1999); *see also Gagliardi v. Village of Pawling,* 18 F.3d 188, 193 (2d Cir.1994) ("it is axiomatic that a plaintiff [bringing a selective enforcement claim under § 1983] must allege that similarly situated persons have been treated differently").

▮ Plaintiffs argue that the City harbored a retaliatory animus against them and selectively prosecuted them for the events of April 22, 2000 because of their opposition to Mayor Kelly. They allege that the City prosecuted them for trespass and disorderly conduct, while declining to prosecute the demolition crew for being "unlawfully on the property, violating the Penal Law, the State Building Code, the terms of their 'permits' and the express provisions of their contract." (Pl.Br. at 16.) Defendants respond that any alleged misconduct of the demolition crew (assuming, *arguendo,* that the demolition was proceeding in violation of the applicable codes) is not even remotely comparable to plaintiffs' actions as a matter of law, because the crew was lawfully on the property carrying out demolition work under an authorized contract. I agree.

▮ The test for determining whether persons similarly situated were selectively treated is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent. *See Penlyn Dev. v. Village of Lloyd Harbor,* 51 F.Supp.2d 255, 264 (E.D.N.Y.1999) (noting that "apples should be compared to apples"). Plaintiff's selective enforcement claim fails because there is no way to objectively construe the acts of the plaintiffs and those of the demolition company as roughly equivalent. Plaintiffs made their way past a police guard and intruded upon an active demolition site, disrupting the work and creating a substantial danger to themselves and others. By contrast, the employees of the demolition company entered the site, acting pursuant to a contract with the City to take down the Building. Tran Camp's employees were authorized by the City to enter the property and to carry out demolition work. Indeed, they were present under the supervision of City employees. Under New York law, one who "enters on premises ... honestly believ[ing] that he is licensed or privileged to enter is not guilty of any degree of criminal trespass." *People v. Basch,* 36 N.Y.2d 154, 159, 365 N.Y.S.2d 836, 840, 325 N.E.2d 156 (1975). Far short of being a trespasser, Tran Camp was an invitee onto the property. The plaintiffs acknowledge in their Complaint that Tran Camp was accompanied and welcomed onto the premises by Peekskill police officers, DiMarzo and the City Building Inspector.

In *Albert v. Carovano,* 851 F.2d 561 (2d Cir.1988), a group of minority college students were suspended for occupying Hamilton College's main administration building in protest of the College's poli-

cies toward South Africa. The students had occupied the building for three days, in violation of a court order adjoining them from disrupting the ingress to or egress from the building. *Id.* at 565. The students brought a selective enforcement claim, asserting that the college had wrongfully disciplined them for refusing to end their occupation of the building. *Id.* at 573. To support their claim, the students alleged, *inter alia,* that the college had failed to adequately discipline white students who had harassed and threatened others who were protesting the College's policy of continued investment in South Africa; failed to discipline or investigate students who made derogatory racial and sexual slurs to black female students; and only reluctantly and belatedly undertook an investigation of death threats of a black woman active in protesting the college's South Africa policy. *Id.* The court concluded that none of the allegations of nonenforcement involved circumstances "reasonably comparable to those surrounding appellants' suspensions, in particular the uncontested fact of an outright refusal to obey the orders of a college official." *Id.* The Second Circuit noted:

> [T]he nature of the infraction and knowledge of the evidence [by defendants] must be sufficiently similar to support a finding of facial inconsistency. Otherwise, every conclusory selective-enforcement claim would lead to [broad] discovery ... and then to a confusing, unmanageable and ultimately incoherent retrial of every [non-enforcement] decision.

*Id.* at 574.

As in *Albert,* the actions of plaintiffs and Tran Camp are not reasonably comparable for this court to uphold a claim for selective enforcement. Tran Camp was invited onto the property by City officials; plaintiffs were trespassers who evaded police barriers and placed themselves and possibly others in imminent danger. A decision by the city to charge trespassers with

trespass against trespassers, and not to charge invitees with trespass, cannot be seen as comparing apples to apples, *see Penlyn,* 51 F.Supp.2d at 264, and thus does not violate plaintiffs' Equal Protection rights as a matter of law.

Assume, *arguendo,* that Tran Camp had violated provisions of the Building Code. For plaintiffs to state a claim for selective prosecution, they would have to allege that they were prosecuted for violating the Code, while Tran Camp was not. Plaintiffs make no such allegation. They were not arrested for failing to adequately prepare the site for demolition, which was one of the violations Tran Camp allegedly made, or for starting demolition without having all of the papers in hand. Rather, plaintiffs were arrested for trespass and disorderly conduct. There is no way to consider the behavior of Tran Camp and the plaintiffs as "roughly equivalent," *Penlyn,* 51 F.Supp.2d at 264, so the claim of selective prosecution cannot stand.

**2. First Amendment Claims**

Plaintiffs also contend that by exercising their First Amendment right of association, speech and petitioning government, they were subjected to retaliatory arrest, imprisonment and criminal prosecution. They assert no independent claim for a violation of their associational rights.

In order to establish a First Amendment retaliation claim, a plaintiff must show that his conduct was protected by the First Amendment and that "defendant's conduct was motivated by or substantially caused by [plaintiff's] exercise of free speech." *Easton v. Sundram,* 947 F.2d 1011, 1015 (2d Cir.1991), *cert. denied,* 504 U.S. 911, 112 S.Ct. 1943, 118 L.Ed.2d 548 (1992). A claim for First Amendment retaliation cannot be sustained "when the criminal prosecution was supported by probable cause." *Duamutef v. Morris,* 956 F.Supp. 1112, 1116 (S.D.N.Y.1997); *Mozzochi v. Borden,* 959 F.2d 1174, 1179–80 (2d Cir.1992) ("An individual does not have the right under the First Amendment to

be free from a criminal prosecution supported by probable cause that is in reality an unsuccessful attempt to deter or silence criticism of the government"); *Singer v. Fulton County Sheriff,* 63 F.3d 110, 120 (2d Cir.1995), *cert. denied,* 517 U.S. 1189, 116 S.Ct. 1676, 134 L.Ed.2d 779 (1996) (upholding dismissal of First Amendment retaliation claim: "if the officer ... had probable cause ... then we will not examine the officer's underlying motive in arresting and charging the plaintiff.").

 A prosecution and conviction, if not overturned, is conclusive evidence that an arrest was supported by the requisite probable cause. *Cameron v. Fogarty,* 806 F.2d 380, 387 (2d Cir.1986) ("[T]he common-law rule, equally applicable to actions asserting false arrest, false imprisonment, or malicious prosecution, was and is that the plaintiff can under no circumstances recover if he was convicted of the offense for which he was arrested."). Here, plaintiffs were convicted for trespassing on an active demolition site. The conviction was, as a matter of law, supported by probable cause to arrest. Any claim of retaliation therefore must fail.

3. Fourth Amendment Claim

 Plaintiffs allege that the decision to hold them for three hours, handcuffed next to an alleged pedophile, was an unreasonable seizure in violation of the Fourth Amendment. This claim, too, lacks merit as a matter of law.

Plaintiffs cannot deny that there was probable cause to arrest them, because they were tried and convicted of the crimes for which they were arrested. The only fact alleged by plaintiffs tending to demonstrate that their Fourth Amendment rights were abridged was their being held after their arrest for three hours. But three hours in police custody following

their arrest does not constitute an unreasonable seizure.

 New York Criminal Procedure Law requires that "[u]pon arresting a person without a warrant, a police officer, after performing without unnecessary delay all recording, fingerprinting and other preliminary police duties required in a particular case, must ... without unnecessary delay bring the arrested person before a local criminal court and file therewith an appropriate accusatory instrument charging him with the offense or offenses in question." N.Y.Crim.Proc.Law § 140.20(1). The Legislature did not set rigid time limits in enacting the statute, nor has the New York Court of Appeals imposed them. *See People v. Brown,* 77 N.Y.2d 422, 568 N.Y.S.2d 575, 570 N.E.2d 223 (1991). Rather, the statute requires that a prearraignment detention "not be prolonged beyond a time reasonably necessary to accomplish the tasks required to bring an arrestee to arraignment." *Id.* In *Brown,* the court held that a delay of arraignment of more than 24 hours was "presumptively unnecessary and, unless explained, constitutes a violation of CPL 140.20(1)." *Id.*

In the present case, plaintiffs were arrested and detained for a mere three hours, after which they were released from custody and issued appearance tickets. They were later convicted of the crimes for which they were charged. In the three hour period, DiMarzo signed a supporting deposition; officers wrote up appearance tickets; and plaintiffs were released. As a matter of law, three hours is not an unreasonably long period for arrest processing in the City of Peekskill.

For the foregoing reasons, defendants' motion to dismiss is granted. I find it unnecessary to reach defendants' other arguments.[2]

---

**2.** In particular, I need not reach defendants' *Heck v. Humphrey* argument. I am, of course, sympathetic to their position that an individual ought not be able to evade the reach of *Heck*—and set up a damages ac-

tion—by declining to assert a defense in his criminal case. The Second Circuit, in limiting the reach of *Heck,* no doubt assumed that reasonable people would assert any and all defenses in a pending criminal proceeding in

This constitutes the decision and order of the Court.

order to avoid conviction. They reckoned without plaintiff's counsel, who has pulled this same stunt several times to the knowledge of the court. Still, I am in no position to overrule the Circuit's view that *Heck* applies only when a defendant is incarcerated.